# Alabama Interstate Power Co. *v.* Mt. Vernon-Woodberry Cotton Duck Co., *et al.,*
## and
# Tallassee Falls Mfg. Co., *et al. v.* Ala. Interstate Power Co., *et al.*

## *Eminent Domain.*

(Decided December 4, 1913. Rehearing denied May 14, 1914.
65 South. 287.)

1. *Electricity; Corporation; Power.*—A foreign corporation organized to produce and supply to the public light, heat, power and any other thing to which electricity or other form of energy is now or may hereafter be applied, has authority to construct, maintain and operate utilities, plants, and machinery to generate electricity by water power artificially created, and to transmit such powers so generated.

2. *Eminent Domain; Public Use; Electricity.*—Where the object of condemnation of a dam and lands is to acquire water power for the generation of electricity for distribution to the public of light, heat and power. the use for which the property is sought to be taken is a public use.

3. *Same.*—Power of eminent domain is an attribute of the sovereignty of the state, and is absolute except as restrained by the Constitution.

4. *Same; Foreign Corporation.*—A foreign corporation lawfully empowered to promote a public use may be authorized by the state to exercise the power of eminent domain, and have the power conferred of the right to take the property of a corporation already condemned under the power of eminent domain.

5. *Same; Legislative Determination; Judicial Review.*—The policy of the statute being no concern of the court, the judgment of the legislature as to the expediency of authorizing the exercise of the power of eminent domain, where the use for which the property is sought to be condemned is public, is conclusive and will not be considered by the court.

6. *Same; Statute; Validity.*—The validity of a statute conferring power to condemn property for public use and requiring compensation therefor. can be attacked only on the ground that the statute is too indefinite and uncertain to be administered, under its own terms, or the power intended to be conferred to be practically utilized. or that it legally discriminates between members of the same class.

7. *Same.*—The subjects of condemnation specified by sections 3627, et seq., Code 1907, are all properties or easements within the classes

[Ala. Int. Power Co. v. Mt. Vernon-Woodberry Cotton Duck Co., et al., and Tallassee Falls Mfg. Co., et al. v. Ala. Int. Power Co., et al.]

or characters of subjects of ownership which the state may make subject to appropriation for public use.

8. *Same.*—Section 3627, et seq., Code 1907, is not invalid on the ground of indefiniteness for failing to define or describe the subjects which may be condemned.

9. *Same.*—Said sections are not invalid for failing to prescribe a method for ascertaining the excess, but the excess may be disclosed by experts so that the court can give effect to the statutory rights.

10. *Same; Jurisdiction; Question for the Court.*—The court must ascertain and determine whether the statutory conditions exist and whether the particular subject sought to be condemned is within the exception made in the statute, and when its jurisdiction is invoked by a petition whether sufficient or insufficient, no other authority may interpose to stay or defeat it.

11. *Same; Acquisition of Property; Effect.*—The taking of property or easements by condemnation proceedings presupposes deprivation of the owner, and compensation must be awarded him for the loss of his property, together with the inconvenience attending condemnation.

12. *Same; Rights Acquired.*—The court confines a party to the property right acquired by condemnation, and a condemnation proceeding under the statute will not be interfered with on the theory that if allowed the condemnor will transgress his limits and interfere with rights not condemned.

13. *Same; Temporary Rights.*—The right conferred by section 3493, Code 1907, is necessarily incident and preliminary to authorized proceedings to condemn and such rights are not conditioned on any other contingency than that the corporations mentioned therein shall have in contemplation proceedings to condemn.

14. *Same.*—The right conferred by section 3493, Code 1907, is conferred on a corporation created to generate and transmit electricity for public use as light, heat and power, and with authority to condemn property for water power to generate electricity.

15. *Constitutional Law; Eminent Domain; Equal Protection.*—The legislature has power to create classes and enact legislation governing each class, provided the classification is not arbitrary, and a statute is not arbitrary as creating an illegal discrimination between members of the same class merely because it does not permit condemantion of rights and property of cotton factories necessary for their operation, or private residences and the things within the curtilage.

16. *Same; Public Policy.*—The courts administer a statute as written if it is valid without considering the wisdom or policy of the statute.

17. *Prohibition; Jurisdictional Acts; Inferior Tribunal.*—Prohibition will not issue to prohibit the courts from proceeding under the statutory system for eminent domain proceedings, since the statute furnishes ample method and opportunity for the determination of every right, and confers on the courts jurisdiction to determine the questions raised.

[Ala. Int. Power Co. v. Mt. Vernon-Woodberry Cotton Duck Co., et al., and Tallassee Falls Mfg. Co., et al. v. Ala. Int. Power Co., et al.]

18. *Same.*—Where the probate court acquired jurisdiction of condemnation proceedings under the statutes made and provided, the chancery court will not enjoin the exercise by the probate court of the jurisdiction conferred on it.

19. *Injunction; Eminent Domain; Interference With.*—Where a corporation entitled to condemn land enters thereon to make the preliminary survey and examination under section 3493, Code 1907, and its entry for that purpose is resisted or will be resisted so as to render probable a clash between the owner and the representative of the corporation, injunction will lie to protect the right of the corporation to enter for the limited purposes of the statute.

(Sayre and de Graffenried, JJ., dissent in part.)

APPEAL from Tallapoosa Circuit Court.

Heard before Hon. S. L. BREWER.

APPEAL from Tallapoosa Chancery Court.

Heard before Hon. W. W. WHITESIDE.

APPEAL from Montgomery City Court.

Heard before Hon. GASTON GUNTER.

Petition for writ of prohibition by the Mt. Vernon-Woodberry Cotton Duck Company and others against the Probate Court of Tallapoosa County, and the judge thereof, and suit in equity by the Tallassee Falls Manufacturing Company and others against the Probate Court and the judge thereof, and a bill in equity by the Alabama Interstate Power Company against the Tallassee Falls Manufacturing Company and others. From a judgment granting an alternative writ of prohibition, and from a decree denying the relief prayed for under the first bill in equity, and from a decree granting the relief prayed for under the second bill in equity, the parties aggrieved appeal. Decrees affirmed, and alternative writ of prohibition quashed, and petition therefor dismissed.

The following is an abstract of the various bills and petitions:

The Mt. Vernon-Woodberry Cotton Duck Company, the Continental Trust Company, as trustee, the Interna-

tional Trust Company as trustee, and the Tallassee Falls Manufacturing Company, filed a petition with the circuit judge of the Fifth judicial circuit, praying that a writ of prohibition issue to the probate court of Tallapoosa county, and to the judge thereof, restraining and prohibiting the said probate court and the judge thereof from hearing and determining certain proceedings instituted in said probate court by the Alabama Interstate Power Company in which it seeks to condemn a certain portion of the dam across the Tallapoosa river at Tallassee owned by the first-named corporation herein, and certain other property or property rights in Tallassee belonging to said last-named corporation. The petition is made an exhibit to the petition for the writ, and the writ attacked the right, under sections 3627-3637, Code 1907, of the Alabama Interstate Power Company, to condemn any portion of the dam of any other corporation, or to condemn lands on which to erect a power house for the use of water to be derived from the condemnation of any part of such dam, and that, if these statutes confer the right sought in the condemnation proceedings, they are unconstitutional and void, as appears from the opinion rendered. The circuit judge issued a rule nisi or alternate writ suspending the proceedings in the probate court, and suspending the right of the Alabama Interstate Power Company to further prosecute such proceedings upon petitioner's giving bond, etc., and the appeal was from this order.

The Tallassee Falls Manufacturing Company, the Mt. Vernon-Woodberry Cotton Duck Company, the Continental Trust Company, as trustee, the International Trust Company of Maryland as trustee, and the Consolidated Cotton Duck Company filed their bill in the chancery court of Tallapoosa county against the Ala-

40—186

bama Interstate Power Company and others, setting up
the prohibition procedings filed with the Honorable S.
L. Brewer, as judge of the Fifth judicial circuit, to pro-
hibit the probate court and the judge thereof of Talla-
poosa county hearing or determining or proceeding to
hear or determine the condemnation proceedings insti-
tuted by the Alabama Interstate Power Company and
others as appears above.   The fact that a rule nisi or
alternate writ was issued, and that from said order or
alternate writ the Alabama Interstate Power Company
had appealed to the Supreme Court, had given security
for costs, and executed a bond which it claims suspend-
ed and superseded said order; that said bond and said
security for costs had been approved by the judge of the
circuit court; that as soon as the said bonds were ap-
proved the said judge of probate of Tallapoosa county
set such condemnation proceedings down for hearing,
and will hear the same on July 18, 1912, unless said
hearing and trial is restrained and enjoined; that there
is no appeal from any judgment the probate court might
render, the only appeal being from the assessment of
damages, and that the probate court was wholly with-
out jurisdiction to grant the relief prayed in said peti-
tion for the reasons assigned in said petition for prohi-
bition, and for other additional reasons.   The petition
proceeds to set out the reasons based on petitioner's con-
struction of the statute or Code section (3627 et seq.)
above mentioned.   The bill also sets out the petition for
condemnation as filed by the Alabama Interstate Power
Company.

The Alabama Interstate Power Company filed its bill
against the Tallassee Falls Manufacturing Company
and others to enjoin pendente lite the said corporation,
its officers, agents, servants, and attorneys from in any

manner interfering with or attempting to interfere with the officers, agents, and servants of orator in making an examination and survey of its proposed lines for the transmission of power and other things over, along, and across the waters and lands of defendant as may be necessary to the selection of the most advantageous routes and cites for the location of orator's proposed lines, power house, and other hydraulic structures on the lands and waters of defendant, and for all of the other purposes mentioned in the application for condemnation so filed by orator in the probate court of Tallapoosa county.

The following analysis of section 3627, Code 1907, is set out as illustrating the purposes and scope of the litigation:

The first part of the section designates to what corporation the law is intended to apply. It relates to corporations, domestic or foreign, having the right to manufacture, supply, and sell to the public, power, produced by water after acquiring, except by condemnation, a dam site, etc. It is said these shall have the following additional rights and powers: (1) To acquire by condemnation lands, etc., for the construction, etc., of said dam at points up or down the stream. (2) To construct and operate its said site, or other point up or down the stream therefrom, a dam, together with all works incident, etc., and, in connection therewith, to impound or divert water, and to raise higher such dam and to enlarge the works necessary, etc. (3) To construct other works necessarily incident or related thereto, either up or down stream therefrom, as may be required or deemed expedient by such corporation in the manufacture and supply of power produced by water as a motive force. (4) To acquire by condemnation all lands or waters or rights or easements in lands or waters (a) likely or lia-

ble to be flooded or damaged by impounding, or diverting the water, etc., or, (b) necessary for the construction or operation of dams or power houses or works necessarily incident or related thereto, or (c) liable to be flooded or damaged by the construction or enlargement of the dams, or works incident, necessary, or related thereto, or damaged or taken in the construction, operation, or use of canals, tailraces, or exit ways, necessary, etc. (5) To acquire substations, etc., by condemnation, with exceptions. But shall have no right (a) to condemn lands, waters, etc., in use for power purposes by other companies having similar powers, or essential to its operation; or (b) lands, etc., held by such other corportation for power purposes, where the lands, waters, etc., in thembselves or in connection with other land, etc., owned can be made the reasonable basis of 1,000 horse power; (c) but may condemn lands, etc., held by such etc., in themselves or in connection, etc., may be made the basis of 500 horse power; (d) and may condemn lands, etc., of such other corporation at any point in excess of such other corporation facilities for using the same (independently of actual or proposed works of the condemning party) for the manufacture of power by its plant as the same is established at the time condemnation proceedings is begun, if it has been in operation for five years; (e) nor shall cotton factories be interfered with except as to excess water, as explained, which may be condemned; (f) may acquire and condemn gristmills, etc.; (g) just compensation shall be first paid, etc.

The statute then gives power (already having a dam site) to acquire by condemnation, for construction of said dam, lands up or down necessary for operation, and to construct at its said original site or at other

points up or down stream a dam, together with all works necessary, etc., and to construct other works as may be required or deemed expedient, and to do this, may acquire by condemnation lands or waters flooded or damaged, or necessary for construction of dams or power houses or works necessary or incident to the construction and operation of the scheme of the corporation as previously authorized, and to acquire substations, etc., with certain restrictions stated, and then certain restrictions on the exercise of the foregoing powers: First, it is said there shall be no power to condemn lands, water, etc., in use for power purposes by other companies having similar powers, and essential to their operation. Second, it is said it shall have no power to condemn lands, waters, etc., held by such other corporations for such power purposes where the lands, water, etc., in themselves or in connection with other lands owned can be made the basis of 1,000 horse power. But in qualification or explanation of this, it is said that the company may condemn lands held by such other corporations at any point unless they may be in themselves, or in connection, a basis of 500 horse power. And further that the company may condemn lands, water, etc., in excess of actual facilities for using the same (independent of the works of the condemning party), provided such other corporation's plant has been in operation five years before proceedings begun. And further providing that there shall be no condemnation as to cotton factories except as to excess water, etc., as previously pointed out. It then appears that the company being established at a point may erect dams and works ad libitum up or down stream for similar purposes, and may condemn ad libitum, to carry out such powers, lands and water and structures with the exceptions named:    (1)

That lands or waters held by other companies having similar powers shall not be condemned if they can, in themselves, or in connection with other lands held, be the basis of 1,000 horse power; (2) that lands, water, etc., in use by companies having similar powers, shall not be condemned provided they may in themselves, or in connection with other lands, water, etc., held, be the basis of 500 horse power, but, if they have not the capacity of 500 horse power, they may be condemned; and (3) in all cases, including cotton factories, excess water, etc., as defined in the statute, may be condemned, but otherwise cotton factories cannot be interfered with. These are the only limitations as to the extent of the power to acquire by condemnation.

THOMAS W. MARTIN, RAY RUSHTON, LAWRENCE MC-FARLANE, GEORGE A. SORRELL, and JAMES W. STROTHER, counsel representing Alabama Interstate Power Company, and the Probate Judge in the various matters here discussed. The right is amply given to the Alabama Interstate Power Company to acquire property, easements and rights by condemnation.—§ 3627, et seq., Code 1907. It is common practice to permit one railroad to condemn and use parts or portion of the rights of way of another railroad not in actual use by such railroad, and hence, there is not anything so very new or different in the present statute.—*E. & W. R. R. Co. v. E. T. V. & G.,* 75 Ala. 275; *A. & C. R. Co. v. J. G. & A. R. R. Co.,* 82 Ala. 297; *M. & G. v. Ala. Mid.,* 87 Ala. 501; *M. & O. v. Postal,* 121 Ala. 21. The property included in the statute includes titles, rights and easements capable of ownership.—§ 2, Code 1907; *Johnson v. State,* 159 Ala. 113; *Farley v. Ala. T. & I. Co.,* 143 Ala. 464; 80 U. S. 264; 90 N. Y. 122; *Ala. C. R. R. Co. v. Mus-*

[Ala. Int. Power Co. v. Mt. Vernon-Woodberry Cotton Duck Co., et al.,
  and Tallassee Falls Mfg. Co., et al. v. Ala. Int. Power Co., et al.]

*grove,* 169 Ala. 424. All the elements which enter into
the value of the property to be taken are embraced
within the term just compensation.—*Jones v. N. O.
Assn.,* 70 Ala. 227; *Commissioners v. Street,* 116 Ala.
28; *M. & O. v. Hester,* 122 Ala. 249; *McEachin v. City of
Tuscaloosa,* 164 Ala. 263; *B'ham Belt v. Lockwood,*
150 Ala. 610. It is not the individuual or the corpora-
tion which determines the question, but the character
of the use.—*Youngblood v. B'ham Co.,* 95 Ala. 521; 194
U. S. 267; 170 U. S. 283. There can be no doubt of the
jurisdiction of the probate court.—*N. O. & M. v. S. &
A. T. Co.,* 53 Ala. 211; *State ex rel. Vandiver v. Burke,*
57 South. 670. Courts are not concerned with the wis-
dom or policy of a valid statute.—*Mobile Co. v. Ala. Co.,*
87 Ala. 501. The court will not go into the sufficiency
vel non of the petition in this proceeding because that is
a matter which will come up under an appeal from the
judgment entered. Prohibition is not the remedy.—56
South 1021, and authorities cited. The right to make a
preliminary survey is given by § 3493, Code 1907, and
this right will be protected by injunction.—*Bir. T. Co.
v. Tel. Co.,* 119 Ala. 144; *Bryan v. M. & A. of B'ham,* 154
Ala. 450.

J. M. CHILTON, for the other interests represented.
Section 3627, Code 1907 has already been construed in
the case of *State ex rel. Attorney General v. Alabama
Power Co.,* 58 South. 462. Judge Brewer properly
granted the alternate writ.—*So. Ry. v. B. S. & N. O. Co.,*
131 Ala. 663. While the recent decision in the case of
*Western Union v. L. & N.,* applies perhaps to the pres-
ent case it fills a very small place in respect to the de-
cision in this case, but especially holds that there can
be no such thing as a condemnation to a public use un-

less there is a necessity therefor.—2 Lewis Eminent Domain, § 420.

McCLELLAN, J.—These three appeals were joined on submission. Their single assignment followed. While there are questions peculiar to each, the subject-matter giving rise to the several contests is common, in a large sense, to all of them. It is probable the decision of some of the appeals might be had without, of necessity, considering fundamental questions that, to now determine, will promote the final adjudication of the matters of real controversy. There are a number of questions made by the respective solicitors that can properly arise, or be presented, only in the proposed condemnation proceeding. To consider them at this time would be premature. Broadly stated, the chief meritorious questions presented now involve the inquiry of authorized power vel non to condemn certain properties or rights in the asserted effort of the condemner to subject and appropriate them to public use.

The proposing condemner is the Alabama Interstate Power Company (hereinafter called the "Power Company"). It was incorporated under the laws of the state of Maine. Its powers as conferred by the charter set out in the record are most ample for producing, supplying, and distributing "to the public light, heat, power, and any other thing to which electricity, or other form of energy, is now or may hereafter be applied." The generation of electricity by means of the water power artificially afforded by a non-navigable water course in this state is the chief and manifestly authorized (by the charter) aim of the condemnor. Such main powers, together with all incidental powers, could not be conferred in broader, as well as more particular, terms than

this charter employs. So far as charter powers are concerned, there can be no doubt of the complete authorization of the power company to construct, maintain and operate utilities, plants, and machinery to promote and effect the purpose generally stated above.

The application of electricity as a motive force or productive energy is a matter of common knowledge and of daily experience.. The generation of electricity by the employment of the means afforded by water power is a process so familiar that neither lawmakers nor courts can be ignorant of its general practicability and wide utility. In natural consequence, where the object of the proposing condemner is the production and distribution of electricity, as a motive power or agency, to the public, without discrimination, for the purpose of supplying power or heat, or other forces of a nature reasonably capable of promoting or affording a use or uses adapted to the general comfort or convenience of all those who may desire them, the use is "public" within the purview of the sovereign authority of the state expressed in the phrase the "right of eminent domain"; and, when authoritatively conferred by the state, the proposing condemner may exercise such right, according to the forms of law prescribed therefor.—Lewis on Eminent Domain, § 268; *Walker v. Shasta Power Co.,* 160 Fed. 856, 87 C. C. A. 660, 19 L. R. A. (N. S.) 725; *Jones v. North Ga. El. Co.,* 125 Ga. 618, 54 S. E. 85, 6 L. R. A. (N. S.) 122, 5 Ann. Cas. 526; *Minn. C. & P. Co. v. Koochiching Co.,* 97 Minn. 429, 107 N. W. 405, 5 L. R. A. (N. S.) 638, 7 Ann. Cas. 1182; *Helena Power Co. v. Spratt,* 35 Mont. 108, 88 Pac. 773, 8 L. R. A. (N. S.) 567, 10 Ann. Cas. 1055; *Minn. C. & P. Co. v. Pratt,* 101 Minn. 197, 112 N. W. 395, 11 L. R. A. (N. S.) 105; *Rockingham L. & P. Co. v. Hobbs,* 72 N. H. 531, 58 Atl. 46, 66 L. R. A.

585; *Power Co. v. Webb*, 123 Tenn. 584, 133 S. W. 105; *In re Niagara Company*, 11 App. Div. 686, 97 N. Y. Supp. 853. The first-cited authority is particularly apt. We quote it:

"The furnishing of electricity to the public for light, heat, and power—that is, to such members of the public within a given territory as may desire the current for any or all of such purposes—is a public use for which the power of eminent domain may be exercised. 'The knowledge recently acquired concerning electricity has made it possible to divide power into any desired portions and to freely transmit the same to almost any point for use. This has created a demand for power which, though not so universal as the demand for water, is nevertheless of a public character. Like water, electricity exists in nature in some form or state, and becomes useful as an agency of man's industry only when collected and controlled. It requires a large capital to collect, store, and distribute it for general use. The cost depends largely upon the location of the power plant. A water power or a location upon tidewater reduces the cost materially. It may happen that the business cannot be inaugurated without the aid of the power of eminent domain for the acquisition of necessary land or rights in land. All these considerations tend to show that the use of land for collecting, storing, and distributing electricity, for the purposes of supplying power and heat to all who may desire it, is a public use, similar in character to the use of land for collecting, storing, and distributing water for public needs—a use that is so manifestly public that it has seldom been questioned and never denied.' And where the object to be accomplished is the production and distribution of electricity to the public for any of the purposes mentioned,

property and property rights may be condemned for whatever purpose is necessary to accomplish such object. Consequently land and water rights may be condemned for dams, reservoirs, canals, and flumes for the creation and utilization of water power to be used in generating the electric current and for works for such generation. Also for works and rights of way for transforming, transmitting, and distributing the current."

The power of eminent domain is an attribute of the sovereignty of the State. Except as restrained by organic law, it is absolute. The state may authorize its exercise by a foreign corporation, lawfully empowered to promote a public use. It may confer thereunder the right to take the property of corporations already condemned under the power of eminent domain.

"It is not the instrumentality employed for operating the public use, but the use itself, that satisfies the Constitution. The fact that the use is public and the public may have the privilege of enjoying it is the controlling principle."—*Columbus Water Co. v. Long,* 121 Ala. 245, 25 South. 702; *Steele v. Com'rs,* 83 Ala. 304, 3 South. 761; *M. & C. R. R. Co. v. R. R. Co.,* 96 Ala. 571, 11 South. 642, 18 L. R. A. 166.

If the use is public, the legislative judgment is conclusive upon the question of the expediency of authorizing the exercise of the power of eminent domain.—*Sadler v. Langham,* 34 Ala. 311, 330. The impolicy of an enactment to that end is no concern of the courts. If the state has authoritatively conferred the power, the courts would be guilty of manifest usurpation if they essayed to censor the policy of the grant, if they undertook a revision through the generally questionable method of an interpretation of the enactment in the light of their notions of what would have been better policy or wiser action.

Given a purpose to confer the power of eminent domain for a public use and conformity to constitutional methods for legislation, the only possible objections to the validity of an enactment to that end, which prescribes for compensation for the property taken, are: (a) That the enactment, on its face, is too indefinite or uncertain to be administered or, the power intended to be conferred, to be practically utilized; (b) that it illegally discriminates between members of the same class —the Legislature having the undoubted prerogative to classify the objects of its treatment so long as it does not arbitrarily create a class or classes. There being in the statute to be quoted no semblance of arbitrary classification, the basis for the second possible objection stated is not present. The power is broadly conferred. Under contingencies, cotton factories are the beneficiaries of an exception. Such factories as are within the exception could not be prejudiced, in any degree, by the statute. Those, only, whose rights are impinged by an enactment, may complain of its constitutional invalidity. Such factories as are not within the exception must, of course, have their subjection to the law attributed to the broad, unclassified, nondiscriminatory power its terms confer. But aside from these considerations, if it should be affirmed that there is a classification in a primary sense, the discriminations are suggested by satisfactory reasons that appear from the face of the statute to have commended themselves to the lawmakers.

The statutory system upon which the asserted right of the power company to condemn is predicated is to be found in article 19 of chapter 69 (Civil Code), section 3627 et seq. The main features of the system with which these appeals are concerned are set forth in section 3627. We quote it:

"All corporations organized under the general laws of this state or heretofore under a special act of the Legislature, and all corporations organized under the laws of any other of the United States, and which have complied with the Constitution and laws of the state of Alabama as to foreign corporations, and which by their charter have the right to manufacture, supply, and sell to the public, power produced by water as a motive force, shall, after acquiring by purchase or otherwise than by condemnation, a dam site or power site comprising not less than one acre of land upon each and opposite sides of any water course, in addition to other powers conferred by law, have the following rights, powers, and authority: To acquire by condemnation the lands and rights necessary for the construction and operation of said dam, and works connected therewith or useful thereto, either up or down stream therefrom, and (in the case of nonnavigable streams) to construct and operate at said site, or other point up or down the stream therefrom, and across said stream, a dam, together with all works incident, necessary, or related thereto, and in connection therewith to impound or divert water of any water course or water courses of this state, and to raise higher such dam and to enlarge the works necessary, related or incident thereto, and to construct other works necessary, incident or related thereto, either up stream or down stream therefrom, as may be required or deemed expedient by such corporation, in the manufacture and supply of power produced by water as a motive force. To acquire by condemnation all lands or waters or interests or rights of easements in lands or waters likely or liable to be flooded or damaged by impounding or diverting the water of any water course in this state, or its tributaries, or necessary for

the construction or operation of dams or power houses, or works necessary, incident, or related thereto, or likely or liable to be flooded or damaged by the construction or operation or enlargement of the dams, or works incident, necessary, or related thereto, or damaged or taken in the construction, operation, or use of canals, tailraces, or exit ways necessary, useful, or convenient for the escape, conveyance or return of the water used in the operation of the works or power plant. To acquire by condemnation the necessary lands for substations and transmission lines, but shall have no right to condemn a private residence, nor the outhouse, garden, nor orchard within the curtilage of a private residence, for a substation site or for rights of way for its transmission line or lines. Such corporation shall have no right to condemn lands, water, or water rights in use for power purposes by another corporation upon the same water course, having similar powers essential to its operations; or lands, water, or water rights held by such other corporation for power purposes where the lands, water, or rights in themselves and taken alone or in connection with other lands, water, or rights owned by such other corporation can be made the reasonable basis of a water power development of at least one thousand continuous horse power; but may condemn lands, hydraulic structures, water, or water rights held by such other corporation at any point upon the same water course, unless the lands, structures, or rights in themselves and taken alone or in connection with other lands or rights owned by such other corporation, can be made the reasonable basis of a water power development of at least five hundred continuous horse power; and may condemn lands, hydraulic structures, water, or water rights of such other corporation, at any point upon the

[Ala. Int. Power Co. v. Mt. Vernon-Woodberry Cotton Duck Co., et al.,
and Tallassee Falls Mfg. Co., et al. v. Ala. Int. Power Co., et al.]

same water course, in excess of such other corporation's actual facilities for using the same (independently of the actual or proposed works of the condemning party) for the manufacture of power by its plant as the same is already established at the time the condemnation proceeding is begun, provided the plant of such other corporation has been in operation for five years or more preceding the commencement of the condemnation proceedings. Nor shall such corporation have the right to condemn the lands, hydraulic structures, water, or water rights of any cotton factory, at any point upon the same water course, in actual and prior use by it for the operation of its plant; but may condemn the lands, hydraulic structures, water, or water rights of such cotton factory in excess of what is actually in use, or may be used at normal stages of the stream, for the operation of its plant as already established at the time the condemnation proceeding is commenced. Such corporation may by condemnation acquire the right to flood grist mills and industries in conjunction therewith, together with lands and water rights appertaining thereto. In all cases just compensation shall first be paid to the owner in the manner provided by law for all property taken."

It is too clear for doubt that the subjects of condemnation specified in the statute are properties or easements within the classes or characters of subjects of ownership which the state may, and has, if the statute is not void for uncertainty or indefiniteness, made amenable to appropriation, for a public use under the power of eminent domain.

From the express terms of the statute, the general authorization of certain agencies to condemn, under certain conditions, is unmistakable. The judicial forum

and proceedings therefor are plainly and validly provided. The public purpose and use to be subserved by the authorization is manifest. The compensation to be made for the property taken is stipulated as a primary condition to the appropriation. So the only possible predicate for an insistence that the statute is void for indefiniteness or uncertainty is that, either it does not define or describe the subjects authorized to be condemned, or it fails to afford a necessary, essential means, method or formula whereby each subject of the authorization to condemn may be selected or individualized and the compensation therefor ascertained, awarded, and paid.

We cannot give sanction to any feature of this hypothesis with the result to attend that the statute would be annulled, in whole or in part. To do so would require of this court the assumption, in several particulars, of a common knowledge in immediate opposition to legislative declaration and enactment. In such a field as this statute intends operation and effect, this court cannot assume a superior information or wisdom to that the Legislature has evinced by formal enactment. While the statute is not phrased with the clearness other writers might have attained in the expression of the ideas it is intended to express, yet it is intelligible. The elements of adverse ownership it would subject to condemnation are plainly enumerated. It is unnecessary to repeat them. It is only when it comes to except, or to define by exclusion, what measure of, and when, certain properties or easements may be appropriated under eminent domain, that there appears a want of that high degree of clearness we are wont to expect in legal enactments or judicial pronouncements, but of the absence of which, in both, all regret to be too often aware. Not-

withstanding this lack of the highest clearness, it. is made manifest by unequivocal terms in the statute that condemnation is not restricted in respect of the complete devotion of the elements enumerated in the statute, to the service of the largest public use and public service, of all possible water power which may be, under engineering skill and with great outlay, applied to the generation of motive force, provided established, elder industries are not denied or deprived of the saving made to their behoof by the terms of the statute. The condemnation, except as restricted to preserve the benefits just mentioned, is not limited to the area, or things in propinquity to the dam provided for in the first paragraph in the statute.   On the contrary, the clear intent appears to be to allow the conception and effectuation of a large, maybe colossal, plan for the reduction to practical, serviceable energy the water power that skilled manipulation and control may extract from, or secondarily create upon, water courses in Alabama.  The initial, major instrumentality for the accumulation, the condensation, as it were, of the latent, undeveloped water power must be the dam specified in the first paragraps of the statute.   But the lawmakers, as we understand the statute, did not intend that the application of the power so created or accumulated should serve but once the public purpose to which it might be devoted. They contemplated, and to that end so provided, that a power so, in a sense, created and so reduced to control should serve to generate a motive force so long as it might be subjected to extraction and transmission or translation as a component part of the scheme of which the dam, affording the impounding from which the accumulated power results, is the "head."   Hence it is in accord with this large conception of, and authority con-

ferred by, the statute that, down stream, the entity the statute describes, and which conforms thereto in respect of the initial dam, should not be limited in the effectuation of its single conception and enterprise to the neighborhood of the dam, in order that a power so created and accumulated should yield its full, unexhausted utility and energy to the public service to which the grant necessarily consecrates it. But from this authorization, made to promote and accomplish the major purpose, exceptions are made. They are the product of reason and are rested upon conditions that merited, in the legislative view, conservation. Private residences and property embraced in the curtilage are excepted from condemnation for substation sites and transmission lines. The lands, water, and water rights in use for power purposes and essential to its operations, of another corporation having similar powers, are excepted. Lands, water, and water rights which alone or in connection with other lands, etc., can be made the reasonable basis of at least 1,000 continuous horse power, are excepted. But lands corporately owned, hydraulic structures, water, and water rights, at any point upon the same water course, may be condemned unless they alone or in association with others owned by the corporation can be made the basis of a water power development of at least 500 continuous horse power; and condemnation may be had, under those circumstances, of those elements of ownership "in excess of such other corporation's actual facilities for using same (independently of the actual or proposed works of the condemning party) for the manufacture of power by its plant as the same is already established at the time the condemnation proceeding is begun." Coming to provide with respect to a cotton factory, the lands, hydraulic structures, water, and water

rights, at every point on the same water course, in actual and prior use by the cotton factory for the operation of its plant, cannot be condemned; but the excess of what is in actual use or may be used at normal stages of the stream, for the operation of its plant as already established at the time the condemnation proceeding is commenced, may be condemned.

At the expense of repetition, after this analysis of the last paragraph of the statute, it is to be noted that the lawmakers intended the maximum in availing of water power. The major purpose was, manifestly, to avert the waste, or unappropriation, of the excess of water power, and with that purpose in view conferred the power to condemn that the excess, in lands, hydraulic structures, water, and water rights, might be husbanded and applied to the generation of a motive force. The statute's theory and purpose and literal prescription do not approximate, even, the indefiniteness and uncertainty that requires the annulment of enactments on that account; unless that factor is found in its omission to define a means, method, or formula whereby the selection and distinct use of each of the subjects may be effected and the compensation ascertained and awarded.

It is, necessarily, the function of the tribunal in which condemnation of this character may be had to determine whether the statute-created conditions to the right to condemn a particular subject described in the statute exists have been met, and it is likewise the function of that tribunal to determine whether the particular subject sought to be condemned is within or without the exceptions made in the statute. That is its jurisdiction; and when invoked—not necessarily by an all-sufficient petition, immune from demurrer—no other authority can rightfully interpose to stay or defeat it. If the pe-

tition is insufficient, and does not alone describe as subjects of condemnation property or easements that cannot, under any circumstances, be condemned, the petition should be tested by motion or demurrer. And we may add at this point that a good part of the argument submitted on these appeals could only have bearing or effect upon issues raised by appropriate motion or demurrer addressed to a petition to condemn.

The statute has defined the subjects of condemnation. Was it the imperative obligation of the lawmakers to prescribe a method or formula whereby each of them might be selected? These subjects of condemnation were, all must admit, fully known to the Legislature. As described and enumerated by that branch of the government, they do not import mere abstractions. They relate to things and natural forces familiar to all. It is not contended, and could not be, that, so far as the courts are concerned, lands, hydraulic structures, water, and water rights belong to the wholly intangible, to the realm of the unknown, for the lawmakers, within their province, have enacted to the contrary. Neither can it be judicially pronounced, with the result to attend that the statute would be, in whole or in part, annulled, that the excess of water power, initially created and accumulated by a dam higher upstream, was and is incapable of separate ascertainment, distinct control, and individual application to the generation of motive force or other form of energy. In adition to the necessary implication the statute affords—which excludes the idea that a right clearly conferred shall be unattainable because method or formula is not particularly prescribed, by the lawmakers, to select and effect the right—the courts are bound to assume, until the contrary is shown by evidence, that those skilled in such matters can and will, in

[Ala. Int. Power Co v. Mt. Vernon-Woodberry Cotton Duck Co., et al.,
  and Tallassee Falls Mfg. Co., et al. v. Ala. Int. Power Co., et al.]

a proper case under general rules of law, supply the practical knowledge and furnish the information to the appropriate tribunal that can and will render available rights, to the public benefit, which the Legislature has unmistakably conferred. If the courts should assume to pronounce void the feature of the statute that provides for the appropriation of the excess of the subjects specified in the statute, it would involve the assertion of a superior common knowledge that does not obtain, and the affirmation, without sound invitation thereto, that the Legislature, in these respects, wrote to no purpose. We find no warrant to annul the statute, in these particulars, in the earnest assertions of fact to that end, which in pleading and brief, are pressed upon us. If upon the hearing of a condemnation proceeding, involving an attempt to condemn an excess the statute describes, the petitioner should fail to meet its obligation to afford the evidential data wherefrom the court may proceed to judgment in the premises, manifestly there could be no valid condemnation—the statute's conferred right would be vain because of the petitioner's failure to meet its obligation. But, obviously, the statute would not be void. So, in omitting the prescription of method or formula for selecting, individualizing, extracting, or controlling the excess allowed to be appropriated, the statute is not invalid. The manifest legislative expectations that engineering skill would enable the courts to give full effect to the rights conferred by the statute might, in these days of great engineering skill and achievement, and until the contrary is made to appear in a concrete case, be assumed to be entirely justified. Certainly, the courts cannot, at this stage and on these records, adversely declare.

The criticism of the policy of and general effect attributed to statute  by the solicitors for the Tallassee

Company have been read with interest. Whether it is well founded is not for the courts to say. Given an enactment that is intelligible on its face and offends no provision of the Constitutions, state or federal—as this statute does not—the courts have no choice or discretion. They must declare and administer the law as written. Its change, if desired by the people of the state, must come through legislative, not judicial, action. The taking of property or easements under eminent domain presupposes the deprivation of the owner in the essential provision for compensation, and the theory, confirmed in the law, embraces the idea that for such deprivation the compensation awarded makes the owner whole. The inconvenience or loss that attends condemnation are all necessarily merged in the sum awarded as compensation. The rules of law for the ascertainment of the sum to be awarded are too well settled—have been too often announced—to need reiteration. So, too, the apprehension, if entertained, is ill-founded that, if condemnation is allowed, the condemnor may, without restraint, transgress its limits or from that point of vantage interfere with rights not condemned. The courts can and will confine every condemnor to the field of his right. It is a main office of the particularity required in the description of the subject of condemnation that the condemner's right may be accurately, judicially ascertained and his activities or use confined thereto.

On May 25, 1912, the power company sought by petition to condemn certain property and rights below the site of its proposed dam on the Tallapoosa river. Parties related in interest to the property and rights sought to be condemned were made respondents in the petition. The hearing was set for a day certain. A few days prior

thereto the judge of the Fifth judicial circuit issued, on the respondents' petition, rule nisi or alternative writ of prohibition requiring the stay of proceedings in or by the probate court in the condemnation matter and ordered the probate judge to show, by the next term of the circuit court of Tallapoosa county, why the hearing of the condemnation proceeding should not be prohibited. The ground of this petition for the writ of prohibition was that the probate court had no jurisdiction to proceed in the premises. An appeal was taken to this court from this order of the judge of the circuit, security for costs was given, and a supersedeas bond executed "all as provided," counsel for the power company assert, "by section 2843 of the Code." This is cause numbered 470 on our docket.

After this appeal was taken from the order of circuit judge, the Tallassee Falls Company and the other respondents in the condemnation proceeding filed their bill in the chancery court of Tallapoosa county whereby injunctive process was sought to effect the purpose manifested by the alternative writ of prohibition, it being made to appear that the probate court—attributing as it did to the appeal and supersedeas the effect of rendering wholy inefficient the order for the alternative writ of prohibition—intended, and was arranging, to proceed with the hearing and determination of the condemnation proposed. Demurrer was sustained to this bill for want of equity, and the injunction pendente lite was dissolved. An appeal was taken. This is cause numbered 472 on our docket.

On May 11, 1912, the power company filed its bill, in the city court of Montgomery, against the Tallassee Falls Company, seeking injunctive process to restrain threatened resistance or interference by the defendant

or its agents in order that the complainant's representative might make the preliminary (to proceedings to condemn) investigations and surveys under Code, § 3493. The motion to discharge or to dissolve the injunction pendente lite was overruled and the equity of the bill affirmed by the city court. An appeal was taken to this court, where this cause is given number 23. The statement, in substance, of the petitions and bills inviting this consideration, is left to the Reporter.

The petition for condemnation has been carefully considered by the court. The statutes (sections 3627 et seq.) upon which the right to condemn being constitutionally valid, and authority for proceedings, in the probate court, to that end being afforded by Code, § 3860 et seq., no doubt is entertained that the jurisdiction of the probate court of Tallapoosa county was invoked by that petition. Its sufficiency as upon motion or demurrer is not considered. Its sufficiency is neither affirmed nor denied. The judicial power to initially hear and determine the question of the freedom of the pleading from amendable defects is, in this character of proceeding, alone conferred by law upon the probate courts, the jurisdiction of which is invoked. Nor is it proper or necessary that this court should, at this stage, determine whether every subject of condemnation sought in the petition may be condemned. The probate court's jurisdiction to hear and determine having attached, that inquiry will be considered and decided by that court. The statutory system for proceeding under eminent domain (Code, § 3860 et seq.) affords ample method and opportunity to contest, and to contest every ruling or action of the trial court during the progress of the hearing and leading to its judgment. It cannot be anticipated or presumed that error favorable or unfavorable to any party

will attend the progress of the contest through the pro-
bate court.

Since the writ of prohibition can legally, only, issue to
prevent a usurpation of jurisdiction or an excess of ju-
risdiction, the alternative writ of prohibition issued by
the judge of the fifth circuit was improvidently issued.
It is quashed and vacated. And, in sequence, the decree
of the chancellor in cause (our number) 472 is affirmed;
for that bill, independent of other fatal considerations,
was, in substance, but an effort to compel obedience to
alternative writ improvidently issued by the judge of the
circuit.

Under the conclusions prevailing with respect to the
right to condemn provided by the statutes, our opinion
concurs with that given effect by the city court in cause
numbered 23.

Code, § 3493, provides:

"Railroads, mining corporations, etc., may enter on
land to make survey, examinations for proposed lines,
works, etc.—Railroads, street railroads, and mining,
manufacturing, power, and quarrying, telegraph and
telephone, and other corporations having rights and
powers to condemn, may cause such examinations and
surveys for their proposed railroads, or lines, as may
be necessary to the selection of the most advantageous
routes and sites, and for such purpose may, by their of-
ficers, agents, and servants, enter upon the lands and
waters of any person, but subject to liability for all dam-
ages done thereto, and may, in the construction of their
lines or sites, cross navigable streams, but must not
impede the navigation thereof; may use, cross, or change
public roads, when necessary, in the construction of
their railways, switches, branches, lines, or buildings,
and must place the public road so crossed, used, or

changed, in condition satisfactory to the county authorities having the control thereof, but where practicable the railroads must go over or under the public roadway, or railroad track, and may also cross or intersect with any other railroad or street railway, and if such crossing or intersection cannot be made by contract or agreement, may acquire the rights thereto by condemnation in the mode provided by law."

The temporary right, and consequent limited immunity (*State v. Simons,* 145 Ala. 95, 40 South. 662), conferred by this statute, is necessarily incident to, and preliminary of, authorized proceedings to condemn, instituted by the entities mentioned therein. Manifestly, the right thereby established is not conditioned—otherwise than upon an authoritative prerogative to exercise the power of eminent domain—upon any other contingency than that the corporations mentioned shall have in contemplation (not already instituted) proceedings to exercise the rights and powers to condemn. The obvious purpose of the statute was to allow preparatory, preliminary investigations and surveys in order to properly prepare for, and to intelligently invoke, condemnation proceedings. The right conferred is valuable and essential to the object it has in view. The order and object and nature of this statutory right—with reference to the later institution of condemnation proceedings—would logically suggest a statutory authorization of the courts where condemnation proceedings are alone initiable, viz., the probate courts, to effect its intent through appropriate orders. But there appears to be no such legislative provision.

In this state of the law, equity alone can vindicate and effectuate the right the statute confers. Where the entry, for the statutory purpose, is resisted or will be re-

sisted in such a way as to render probable a clash, be-
tween the proprietor and the proposing condemnor's
representatives, and the opposition of force to defeat the
investigation and survey assured by the statute, no other
remedy is afforded by our courts than that of injunctive
process issuing upon a bill in equity fairly disclosing
the right to enter for the limited temporary purpose the
statute provides and showing, through appropriate aver-
ments, that the proprietor whose premises are desired to
be entered, under the right created, has threatened or
will resist or unduly affirmatively hinder the effectuation
of such right of entry.　As indicated before, the then
pendency of proceedings to condemn is not essential to
the equity of such a bill.　The right established by this
statute (section 3493) is conferred upon corporations of
the character, and created for the purposes, of the Ala-
bama Interstate Power Company, the leading charter
powers of which have been mentioned.　While the stat-
ute employs words in inapt relation to some kinds of
"manufacturing" and "quarrying" corporations having
the power to condemn, there appears from the whole
statute an unmistakable legislative intent to confer the
right upon corporations other than those commonly call-
ed railroad, telephone, and telegraph companies.　The
enumeration of the repositories of the right made in the
first sentence of the statute negatives the notion that
only corporations intending the construction of purely
transportation agencies are within the statute.　The ref-
erence to changes wrought by the construction of rail-
ways, etc., has no effect to qualify the ample authoriza-
tion made in the first part of the statute; and these
references are, of course, apt in respect of corporate
proposals of the character naturally leading to the
changes such constructions may make in highways, etc.,

and not at all inconsistent with the interpretation that the right established is conferred on "manufacturing" and other corporations having the rights and powers to condemn. We cannot read the statute in the very restricted sense in which it is contended it should be read.

Causes numbered 23 and 472 are affirmed. In cause numbered 470 judgment is entered quashing and vacating the alternative writ of prohibition and dismissing the petition therein.

DOWDELL, C. J., and SAYRE and SOMERVILLE, JJ., concur.

### ON REHEARING.

PER CURIAM.—Upon consideration, the applications for rehearing are denied.

SAYRE, J.—(dissenting in part).—In my opinion the completion of the dam at Cherokee Falls and the enlargement thereby of the normal power capacity of the stream is a condition precedent to the right of the power company to condemn the hydraulic or other structures of the Tallassee Company. Hence I think the survey of the Tallassee Falls property was undertaken prematurely and without authority to be found in the statute or elsewhere. The Tallassee Falls Company had therefore the right to prevent intrusions upon its property, though made under the pretense of a preliminary survey. I hold therefore that the decree of the city court of Montgomery should be reversed.

I concur in the conclusion reached in the other cases on the ground that the questions there sought to be raised will have proper consideration in the probate court.

DE GRAFFENRIED, J.—(dissenting).—1. Section 23 of the Constitution provides that:

"Private property shall not be taken for private use, or for the use of corporations, other than municipal, without the consent of the owner."

The entire theory upon which the doctrine of eminent domain is based is that the private right in a particular piece of property shall give way to the public good. Of course, coupled with the doctrine is the essential requirement that the private individual whose rights are thus invaded shall receive compensation in money for the property condemned to the public use.—*People v. Salem,* 20 Mich. 452, 4 Am. Rep. 400; *Sadler v. Langham,* 34 Ala. 311; *Western Union Tel. Co. v. S. & N. A. R. R.Co.,* 184 Ala. 66, 62 South. 788.

2. Sections 3627 and 3636 of the Code of 1907 belong to the same article of the Code, relate to the same subject, are in pari materia, and, confessedly, must be read and construed together. Those sections are as follows:

"All corporations organized under the general laws of this state or heretofore under a special act of the Legislature, and all corporations organized under the laws of any other of the United States, and which have complied with the constitution and laws of the state of Alabama as to foreign corporations, and which by their charter have the right to manufacture, supply, and sell to the public, power produced by water as a motive force, shall, after acquiring by purchase or otherwise than by condemnation, a dam site or power site comprising not less than one acre of land upon each and opposite sides of any water course, in addition to other powers conferred by law, have the following rights, powers, and authority: To acquire by condemnation the lands and rights necessary for the construction and operation

of said dam, and works connected therewith or useful thereto, either up or down stream therefrom, and (in the case of nonnavigable streams) to construct and operate at said site, or other point up or down the stream therefrom, and across said stream, a dam, together with all works incident, necessary, or related thereto, and in connection therewith to impound or divert water of any water course or water courses of this state, and to raise higher such dam and to enlarge the works necessarily related or incident thereto, and to construct other works necessary, incident or related thereto, either up stream or down stream therefrom, as may be required or deemed expedient by such corporation in the manufacture and supply of power produced by water as a motive force. To acquire by condemnation all lands or waters or interests or rights or easements in lands or waters likely or liable to be flooded or damaged by impounding or diverting the water of any water course in this state, or its tributaries, or necessary for the construction or operation of dams or power houses, or works necessary, incident, or related thereto, or likely or liable to be flooded or damaged by the construction or operation or enlargement of the dams, or works incident, necessary, or related thereto, or damaged or taken in the construction, operation, or use of canals, tailraces, or exit ways necessary, useful, or convenient for the escape, conveyance or return of the water used in the operation of the works or power plant. To acquire by condemnation the necessary lands for substations and transmission lines, but shall have no right to condemn a private residence, nor the outhouse, garden, nor orchard within the curtilage of a private residence, for a substation site or for rights of way for its transmission line or lines. Such corporation shall have no right to condemn lands,

water, or water rights in use for power purposes by an-
other corporation upon the same water course, having
similar powers and essential to its operations; or lands,
water, or water rights held by such other corporation for
power purposes where the lands, water, or rights in
themselves and taken alone or in connection with other
lands, water, or rights owned by such other corporation,
can be made the reasonable basis of a water power de-
velopment of at least one thousand continuous horse
power; but may condemn lands, hydraulic structures,
water, or water rights held by such other corporation
at any point upon the same water course, unless the
lands, structures, or rights in themselves, and taken alone
or in connection with other lands or rights owned by
such other corporation can be made the reasonable basis
of a water power development of at least five hundred
continuous horse power, and may condemn lands, hy-
draulic structures, water, or water rights of such other
corporation, at any point upon the same water course,
in excess of such other corporation's actual facilities for
using the same (independently of the actual or proposed
works of the condemning party) for the manufacture of
power by its plant as the same is already established
at the time the condemnation proceeding is begun, pro-
vided the plant of such other corporation has been in op-
eration for five years or more preceding the commence-
ment of the condemnation proceedings. Nor shall such
corporation have the right to condemn the lands, hy-
draulic structures, water, or water rights of any cotton
factory, at any point upon the same water course, in ac-
tual and prior use by it for the operation of its plant;
but may condemn the lands, hydraulic structures, wa-
ter, or water rights of such cotton factory in excess of
what is actually in use, or may be used at normal stages

of the stream, for the operation of its plant as already established at the time the condemnation proceeding is commenced. Such corporation may by condemnation acquire the right to flood grist mills and industries in conjunction therewith, together with lands and water rights appertaining thereto. In all cases just compensation shall first be paid to the owner in the manner provided by law for all property taken."—Section 3627.

"Any corporation which exercises any of the rights conferred by this article, shall, after the completion of its works and plants, be under the duty and obligation to the public to manufacture and sell to the public electric current produced at its plants, and any corporation manufacturing, selling and supplying power, heat, light, or electricity produced by water as a motive force under the provisions of this article, must sell such power, heat, light, or electricity to any person or persons, municipal or other corporations, in the order in which requests or demands are made for such light, heat, power, or electricity. Nothing herein, however, shall be construed to require any such corporation to furnish light, heat, power, or electricity to any person or persons, corporation or corporations, until satisfied of his or its financial responsibility, and except in conformity with its reasonable rules and regulations and reasonable prices for the same, and except as far as the capacity of its plant will permit."—Section 3636.

3. I direct attention to that clause in section 3636 of the Code which declares that "any corporation which exercises any of the rights conferred by this article, shall, after the completion of its works and plants, be under the duty and obligation to the public to manufacture and sell to the public electric current," etc. In other words, under the express language of section 3636

of the Code, the Alabama Interstate Power Company will
be under no duty to serve the public until it constructs
its dam at the dam site which it has obtained by pur-
chase and at said dam site has completed its necessary
works and plants.  In fact, a careful reading of section
3627 of the Code and of the entire article of the Code of
which it forms a part convinces me that it was the plain
purpose of the legislature, in said section and article, to
invest, first, the right of condemnation, in the corpora-
tion seeking to take advantage of its terms, of all prop-
erties necessary to the proper construction of a dam,
power plant, and other structures necessary and appro-
priate to its use for the purposes indicated in the chap-
ter, and then, after the construction of such dam, pow-
er plant, and other structures, etc., at such dam site, sec-
ond, the right to condemn, below the dam power plant,
etc., so constructed on the same stream, the unused and
unneeded parts of other dams, hydraulic structures, etc.
It is, of course, necessary that a corporation which is
chartered to serve the public shall be given the right
to condemn sufficient private property to enable it to
complete the works necessary to the proper perform-
ance of its public functions.  In the instant case the
Interstate Power Company has purchased a dam site
on the Tallapoosa river, a nonnavigable stream, and,
while it alleges in its pleadings that it has expended
much money in and about its contemplated improve-
ment, it does not allege that it has constructed or even
commenced the construction of a dam, a power plant,
or any other sort of hydraulic structure on said stream
at said dam site or at any other point on said stream.
While its pleadings abound in allegations as to what the
Interstate Power Company intends in the future to do,
the bald fact remains that all that it really shows, by

its pleadings to have actually done, is that it has bought, on each side of the Tallapoosa river, an acre or two of ground as a site for a dam which it intends in the future to erect for the purpose of impounding the waters of the river above the dam. I can readily see how the acquisition by the power company of this dam site can be held to confer upon it the right of condemnation of lands and properties above the dam site which are likely to be needed by the company in impounding the water above the dam. I can also readily see that, if the company now needs more land than it now possesses at or near the dam site, either up or down the stream for the purpose of properly constructing its dam, power house, and other necessary structures, it should be held to possess the power to condemn such lands. In so far as the instant case is concerned, the purchase by the Interstate Power Company of the dam site was a necessary preliminary to the erection by it of a dam or dams on the Tallapoosa river and through the water thus impounded above the dam or dams to serve the public. As it was thought by the legislature that the water thus impounded above the dam or dams would, when a power company authorized to exercise the powers conferred by the article commenced operations, increase the normal flow of water in the river below the dam or dams, the legislature conferred the power, to be exercised as an incident to the real, true improvement of the river by the power company because of the erection of such dam or dams, to condemn the unused and unneeded portions of dams, etc., of private parties down stream. In this way the power company could perpetually, at all available points down the stream, get the benefit of the increased power which the water which it had impounded had added to the stream, and at the same time do no harm to

a private enterprise already established on the stream below the dam.

4. Under the holding of the majority, a foreign cororation which has obtained a license to do business in this state has, in so far as the real truth of this matter is concerned, by the purchase of an acre or two of ground on each side of the Tallapoosa river, acquired the right to now condemn to its use all of the unneeded portions of every private dam on the river below the proposed dam site, although it is not required by the act under which this power of condemnation is held to have been conferred to do any service for the public until "after the completion of its works and plants" at the proposed dam site. In my opinion this proposed condemnation of property 10 miles below the proposed dam site is shown by the pleadings to be totally unnecessary to the erection by the Interstate Power Company of its "works and plants," has no connection with such erection, and that, until the power company sees proper to complete its "works and plants," no public necessisty for the proposed condemnation can be shown. When the "works and plants" have been completed—if, indeed the power company sees proper at some time in the future to do so—then, according to my construction of the statute the power company may be held to possess the power it now seeks to put into exercise. In my opinion the completion by the power company of its "works and plants" is a condition which must precede any such condemnation as is sought by this proceeding.